Justice Kennedy
delivered the opinion of the Court.
Fernando Belmontes, the respondent here, was tried in 1982 in the Superior Court of the State of California in and for the County of San Joaquin. A jury returned a verdict of murder in the first degree and then determined he should *10 be sentenced to death. The issue before us concerns a jury instruction in the sentencing phase.
The trial court, following the statute then in effect, directed the jury, with other instructions and in a context to be discussed in more detail, to consider certain specific factors either as aggravating or mitigating. The trial court further instructed the jury to consider “[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.” App. 184. Under the then-applicable statutory scheme this general or catchall factor was codified at Cal. Penal Code Ann. § 190.3(k) (West 1988); and it is referred to as “factor (k).”
Belmontes contended, on direct review, in state collateral proceedings, and in the federal habeas proceedings giving rise to this case, that factor (k) and the trial court’s other instructions barred the jury from considering his forward-looking mitigation evidence — specifically evidence that he likely would lead a constructive life if incarcerated instead of executed. The alleged limitation, in his view, prevented the jury from considering relevant mitigation evidence, in violation of his Eighth Amendment right to present all mitigating evidence in capital sentencing proceedings. See, e. g., Penry v. Johnson, 532 U. S. 782, 797 (2001); Skipper v. South Carolina, 476 U. S. 1, 4-5, 8 (1986); Eddings v. Oklahoma, 455 U. S. 104, 112 (1982). The California Supreme Court, affirming the judgment and sentence, rejected this contention and other challenges. People v. Belmontes, 45 Cal. 3d 744, 799-802, 819, 755 P. 2d 310, 341-343, 355 (1988).
In February 1994, after exhausting state remedies, respondent filed an amended federal habeas petition. The United States District Court for the Eastern District of California denied relief, App. to Pet. for Cert. 140a-141a, 145a, but a divided panel of the United States Court of Appeals for the Ninth Circuit reversed in relevant part, Belmontes v. Woodford, 350 F. 3d 861, 908 (2003). Over the dissent of eight judges, the Court of Appeals denied rehearing en banc. *11 Belmontes v. Woodford, 359 F. 3d 1079 (2004). This Court granted certiorari, vacated the judgment, and remanded for further consideration in light of Brown v. Payton, 544 U. S. 133 (2005). Brown v. Belmontes, 544 U. S. 945 (2005). On remand, a divided panel again invalidated respondent’s sentence; it distinguished Payton on the grounds that the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, though applicable in that case, does not apply here. Belmontes v. Brown, 414 F. 3d 1094, 1101-1102 (2005). Over yet another dissent, the Court of Appeals again denied rehearing en banc. Belmontes v. Stokes, 427 F. 3d 663 (2005). We granted certiorari, 547 U. S. 1110 (2006), and now reverse.
I
The evidence at trial showed that in March 1981, while burglarizing a home where two accomplices had attended a party, respondent unexpectedly encountered 19-year-old Steacy McConnell. Respondent killed her by striking her head 15 to 20 times with a steel dumbbell bar. Respondent had armed himself with the dumbbell bar before entering the victim’s home. See Belmontes, supra, at 760-764, 755 P. 2d, at 315-317.
In the sentencing phase of his trial Belmontes introduced mitigating evidence to show, inter alia, that he would make positive contributions to society in a structured prison environment. Respondent testified that, during a previous term under the California Youth Authority (CYA), he had behaved in a constructive way, working his way to the number two position on a fire crew in the CYA fire camp in which he was incarcerated. App. 44-45, 53. About that time he had embraced Christianity and entered into a Christian sponsorship program. He admitted that initially he participated in this program to spend time away from the camp. Later, after forming a good relationship with the married couple who were his Christian sponsors, he pursued a more religious life and was baptized. Although his religious commit *12 ment lapsed upon his release from the C YA, he testified that he would once again turn to religion whenever he could rededicate himself fully to it. Id., at 46-48, 53-55. Finally, he answered in the affirmative when asked if he was “prepared to contribute in anyway [he] can to society if [he was] put in prison for the rest of [his] life.” Id., at 58.
Respondent’s former CYA chaplain testified at the sentencing hearing that respondent’s conversion appeared genuine. The chaplain, describing respondent as “salvageable,” expressed hope that respondent would contribute to prison ministries if given a life sentence. Id., at 79-83. An assistant chaplain similarly testified that, based on past experience, respondent likely would be adept at counseling other prisoners to avoid the mistakes he had made when they leave prison. Id., at 95-96. And respondent’s Christian sponsors testified he was like a son to them and had been a positive influence on their own son. They also indicated he had participated in various activities at their church. Id., at 99-103, 110-114.
After respondent presented his mitigating evidence, the parties made closing arguments discussing respondent’s mitigating evidence and how the jury should consider it. Respondent was also allowed to provide his own statement. The trial judge included in his instructions the disputed factor (k) language, an instruction that has since been amended, see Cal. Jury Instr., Crim., No. 8.85(k) (2005).
II
In two earlier cases this Court considered a constitutional challenge to the factor (k) instruction. See Brown v. Pay-ton, supra; Boyde v. California, 494 U. S. 370 (1990). In Boyde, the Court rejected a claim that factor (k), with its focus on circumstances “ 'extenuating] the gravity of the crime,’” precluded consideration of mitigating evidence unrelated to the crime, such as evidence of the defendant’s background and character. Id., at 377-378, 386. The *13 “proper inquiry,” the Court explained, “is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.” Id., at 380. Since the defendant in Boyde “had an opportunity through factor (k) to argue that his background and character ‘extenuated’ or ‘excused’ the seriousness of the crime,” the Court saw “no reason to believe that reasonable jurors would resist the view, ‘long held by society,’ that in an appropriate case such evidence would counsel imposition of a sentence less than death.” Id., at 382 (citing Penry v. Lynaugh, 492 U. S. 302, 319 (1989)). During the sentencing phase in Boyde, moreover, the defense had presented extensive evidence regarding background and character, so construing factor (k) to preclude consideration of that evidence would have required the jurors not only to believe that “the court’s instructions transformed all of this ‘favorable testimony into a virtual charade,’ ” 494 U. S., at 383 (quoting California v. Brown, 479 U. S. 538, 542 (1987)), but also to disregard another instruction requiring the jury to “ ‘consider all of the evidence which has been received during any part of the trial of this case,”’ 494 U. S., at 383.
In Payton, the Court again evaluated arguments that factor (k) barred consideration of constitutionally relevant evidence — this time, evidence relating to postcrime rehabilitation, rather than precrime background and character. See 544 U. S., at 135-136. Payton did not come to this Court, as had Boyde, on direct review, but rather by federal habeas petition subject to AEDPA. Relief was available only if “the state court’s adjudication of the claim ‘resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.’” Payton, supra, at 141 (quoting 28 U. S. C. § 2254(d)(1)). Although the prosecutor in Payton had argued to the jury — incorrectly—that *14 factor (k) did not permit consideration of postcrime rehabilitation evidence, this Court concluded that the California Supreme Court reasonably applied Boyde in finding no Eighth Amendment violation. 544 U. S., at 142, 146-147. Accepting the prosecutor’s reading would have required “the surprising conclusion that remorse could never serve to lessen or excuse a crime.” Id., at 142. Furthermore, countering any misimpression created by the prosecution’s argument, the defense in Payton had presented extensive evidence and argument regarding a postcrime religious conversion and other good behavior. The trial court had instructed the jury to consider all evidence admitted “‘during any part of the trial in this case, except as you may be hereafter instructed,’” and the prosecution itself “devoted substantial attention to discounting [the postcrime evidence’s] importance as compared to the aggravating factors.” Id., at 145-146. Hence, the state court in Payton could reasonably have concluded that, as in Boyde, there was no reasonable likelihood that the jury understood the instruction to preclude consideration of the postcrime mitigation evidence it had heard. 544 U. S., at 147.
III
As the Court directed in Boyde, we inquire “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.” 494 U. S., at 380. Here, as in Payton, respondent argues that factor (k) prevented the jury from giving effect to his forward-looking evidence. And, as in Payton, respondent’s case comes to this Court in federal habeas proceedings collaterally attacking the state court’s ruling. Unlike in Payton, however, the federal petition in this case was filed before AEDPA’s effective date. AEDPA and its deferential standards of review are thus inapplicable. See Woodford v. Garceau, 538 U. S. 202, 210 (2003). The Court of Appeals distin *15 guished Payton on this ground. See 414 F. 3d, at 1101-1102. It was mistaken, however, to find a “reasonable probability” that the jury did not consider respondent’s future potential. Id., at 1138.
A
The Court of Appeals erred by adopting a narrow and, we conclude, an unrealistic interpretation of factor (k). “Most naturally read,” the Court of Appeals reasoned, “this instruction allows the jury to consider evidence that bears upon the commission of the crime by the defendant and excuses or mitigates his culpability for the offense.” Id, at 1134. As both Boyde and Payton explain, however, this interpretation is too confined. “The instruction did not . . . limit the jury’s consideration to ‘any other circumstance of the crime which extenuates the gravity of the crime.’ The jury was directed to consider any other circumstance that might excuse the crime.” Boyde, swpra, at 382; see also Payton, supra, at 141-142. And just as preerime background and character (Boyde) and postcrime rehabilitation (Payton) may “extenuare] the gravity of the crime,” so may some likelihood of future good conduct count as a circumstance tending to make a defendant less deserving of the death penalty. Cf. Skipper, 476 U. S., at 4-5 (explaining that while inferences regarding future conduct do not “relate specifically to [a defendant’s] culpability for the crime he committed,” those inferences are “ ‘mitigating’ in the sense that they might serve ‘as a basis for a sentence less than death’ ” (quoting Lockett v. Ohio, 438 U. S. 586, 604 (1978) (plurality opinion))).
The Court of Appeals failed to heed the full import of Pay-ton’s holding, a holding that has significance even where AEDPA is inapplicable. Payton indicated that reading factor (k) to preclude consideration of postcrime evidence would require “the surprising conclusion that remorse could never serve to lessen or excuse a crime.” 544 U. S., at 142. So, too, would it be counterintuitive if a defendant’s capacity to *16 redeem himself through good works could not extenuate his offense and render him less deserving of a death sentence.
In any event, since respondent sought to extrapolate future behavior from precrime conduct, his mitigation theory was more analogous to the good-character evidence examined in Boyde and held to fall within factor (k)’s purview. See 494 U. S., at 381 (describing the evidence at issue as including evidence of the defendant’s “strength of character”). Both types of evidence suggest' the crime stemmed more from adverse circumstances than from an irredeemable character. See 414 F. 3d, at 1141-1142 (O’Scannlain, J., concurring in part and dissenting in part); cf. Johnson v. Texas, 509 U. S. 350, 369 (1993) (noting that the “forward-looking” future-dangerousness inquiry “is not independent of an assessment of personal culpability”).
B
Our interpretation of factor (k) is the one most consistent with the evidence presented to the jury, the parties’ closing arguments, and the other instructions provided by the trial court. Each of these will be discussed in turn.
As the Court of Appeals recognized, future-conduct evidence was central to the mitigation case presented by the defense. See 414 F. 3d, at 1134. Indeed, although the defense also adduced evidence of a troubled upbringing, respondent testified that he could not use his difficult life “as a crutch to say I am in a situation right now, I’m here now because of that.” App. 40. Given this assertion, and considering the extensive forward-looking evidence presented at sentencing — evidence including testimony from two prison chaplains, respondent’s church sponsors, and respondent himself — the jurors could have disregarded respondent’s future potential only if they drew the unlikely inference that “the court's instructions transformed all of this ‘favorable testimony into a virtual charade,’” Boyde, supra, at 383 (quoting Brown, 479 U. S., at 542). It is improbable the ju *17 rors believed that the parties were engaging in an exercise in futility when respondent presented (and both counsel later discussed) his mitigating evidence in open court.
Arguments by the prosecution and the defense assumed the evidence was relevant. The prosecutor initially discussed the various factors that were to guide the jury. He referred to factor (k) as “a catchall.” App. 153. He then discussed respondent’s religious experience in some detail. With respect to whether this experience fit within factor (k), he indicated: “I’m not sure it really fits in there. I’m not sure it really fits in any of them. But I think it appears to be a proper subject of consideration.” Id., at 154. These seemingly contradictory statements are explained by the prosecutor’s following comments.
The prosecutor suggested (quite understandably on the record) that respondent’s religious evidence was weak. He stated: “You know, first of all, it’s no secret that the evidence upon which the defendant’s religious experience rests is somewhat shaky.” Ibid. He also opined that the experience had to be taken “with a grain of salt.” Id., at 155. The jury would have realized that, when the prosecutor suggested respondent’s religious experience did not fit within factor (k), he was discussing the persuasiveness of the evidence, not the jury’s ability to consider it. After all, he thought religion was “a proper subject of consideration.” Id., at 154.
The prosecutor then discussed how the jury should weigh respondent’s “religious awakening”:
“I suppose you can say it would be appropriate because — in this fashion: The defendant may be of value to the community later. You recall the people talking about how he would have the opportunity to work with other prisoners in prison. And I think that value to the community is something that you have to weigh in. There’s something to that.
“On the other hand, the fact that someone has religion as opposed to someone doesn’t should be no grounds for *18 either giving or withholding life. I mean let’s turn it around and look at the other side of the coin. Suppose someone said he didn’t belong to a church and didn’t talk to a minister. Would that man deserve to die merely because of that? So if he says he has religion, does he deserve the other penalty, life? I don’t think that that should be an influencing factor at all in that respect. I don’t think the law contemplates that and I don’t think it’s right.” Id., at 155.
These remarks confirmed to the jury that it should analyze respondent’s future potential, his future “value to the community.” Ibid. This is what respondent himself wanted it to do. And while the prosecutor commented that the law did not contemplate jury consideration of respondent’s religious conversion, respondent did not argue that the jury should consider the mere fact that he had discovered religion. Rather, as manifested by his arguments on appeal, respondent wanted to use this religious evidence to demonstrate his future “value to the community,” not to illustrate his past religious awakening. Nothing the prosecutor said would have convinced the jury that it was forbidden from even considering respondent’s religious conversion, though surely the jury could discount it; and nothing the prosecutor said would have led the jury to think it could not consider respondent’s future potential, especially since he indicated that this is exactly what the jury had “to weigh” in its deliberation. Ibid.
After the prosecutor concluded his arguments, the trial judge allowed respondent to speak on his own behalf. Respondent, while not showing any remorse, suggested that life imprisonment offered “an opportunity to achieve goals and try to better yourself.” Id., at 163. He also stated: “I myself would really like to have my life and try to improve myself.” Id., at 164. Respondent’s personal pleas were consistent with a trial in which the jury would assess his future prospects in determining what sentence to impose.
*19 Defense counsel’s closing arguments confirm this analysis. To be sure, commenting on the mitigating evidence, he initially indicated: “I’m not going to insult you by telling you I think [the mitigating evidence] excuses in any way what happened here. That is not the reason I asked these people to come in.” Id., at 166. Read in context defense counsel’s remarks did not imply the jury should ignore the mitigating evidence. Rather, conforming to the dichotomy within factor (k) itself, his remarks merely distinguished between a legal excuse and an extenuating circumstance. Cf. Cal. Penal Code Ann. § 190.3(k) (“[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime”).
That defense counsel did, in fact, want the jury to take into account respondent’s future potential became manifest near the end of his argument. He suggested that the “people who came in here [and] told you about [respondent]” provided the jury with “a game plan” for what respondent could do with his life. App. 170. He continued: “We’re just suggesting the tip of the iceberg because who knows in 20, 30, 40, 50 years what sorts of things he can do, as he fits into the system, as he learns to set his goals, to contribute something in whatever way he can.” Ibid. This would have left the jury believing it could and should contemplate respondent’s potential.
Other instructions from the trial court make it quite implausible that the jury would deem itself foreclosed from considering respondent’s full case in mitigation. Before enumerating specific factors for consideration — factors in-eluding the circumstances of the crime, the defendant’s age, and “[t]he presence or absence of any prior felony conviction,” id., at 184, as well as the factor (k) catchall — the judge told the jury: “In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial of this case, *20 except as you may be hereafter instructed.” Id., at 183. After listing the factors, he indicated:
“After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
“If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.” Id., at 185.
The judge then gave a supplemental instruction regarding aggravating and mitigating factors:
“I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case.
"However, the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death penalty or a death sentence upon Mr. Belmontes. You should pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case.” Id., at 185-186.
Given the evidence and arguments presented to the jury, these instructions eliminate any reasonable likelihood that a *21 juror would consider respondent’s future prospects to be beyond the bounds of proper consideration. The judge told the jury to consider “all of the evidence,” and “all of the evidence” included respondent’s forward-looking mitigation case. While the judge did end his broad command to appraise all the evidence with the qualifier “except as you may be hereafter instructed,” id., at 183, he did not later instruct the jury that it should disregard respondent’s future potential in prison. The jury could not fairly read the limitation in the instruction to apply to respondent’s central mitigation theory. By contrast, in response to a juror’s question, the trial judge specifically instructed the jury not to consider whether respondent could receive psychiatric treatment while in prison.
The sharp contrast between the court’s instruction on aggravation (that only enumerated factors could be considered) and its instruction on mitigation (that listed factors were “merely . . . examples,” id., at 186) made it clear that the jury was to take a broad view of mitigating evidence. Coming back to back, the instructions conveyed the message that the jury should weigh the finite aggravators against the potentially infinite mitigators. That the trial judge told the jury to “pay careful attention” to the listed mitigating factors, ibid., moreover, did not compel the jury to give them sole consideration. For this to be the case, the jury would have had to fail to take the judge at his word. The judge did not advise the jury to pay exclusive attention to the listed mitigating circumstances, and he had told the jury that these circumstances were simply examples.
It is implausible that the jury supposed that past deeds pointing to a constructive future could not “extenuat[e] the gravity of the crime,” as required by factor (k), much less that such evidence could not be considered at all. Boyde concludes that in jury deliberations “commonsense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplit *22 ting.” 494 U. S., at 381. Here, far from encouraging the jury to ignore the defense’s central evidence, the instructions supported giving it due weight.
In concluding otherwise, the Court of Appeals cited queries from some of the jurors as evidence of confusion. Although the jury’s initial question is not in the record, it appeared to ask the judge about the consequences of failing to reach a unanimous verdict. Cf. 414 F. 3d, at 1135. In response, the judge reread portions of the instructions and stated that “all 12 jurors must agree, if you can.” App. 190. Before the judge sent the jury back for further deliberation, the following exchange took place:
“JUROR HERN: The statement about the aggravation and mitigation of the circumstances, now, that was the listing?
“THE COURT: That was the listing, yes, ma’am.
“JUROR HERN: Of those certain factors we were to decide one or the other and then balance the sheet?
“THE COURT: That is right. It is a balancing process. Mr. Meyer?
“JUROR MEYER: A specific question, would this be an either/or situation, not a one, if you cannot the other?
“THE COURT: No. It is not that.
“JUROR MEYER: It is an either/or situation?
“THE COURT: Exactly. If you can make that either/or decision. If you cannot, then I will discharge you.
“JUROR HAILSTONE: Could I ask a question? I don’t know if it is permissible. Is it possible that he could have psychiatric treatment during this time?
“THE COURT: That is something you cannot consider in making your decision.” Id., at 191.
The Court of Appeals decided Juror Hern’s questions indicated she thought (incorrectly) that only listed mitigating factors were on the table — an error, in the Court of Appeals’ *23 view, that should have prompted a clarifying instruction confirming that all the mitigating evidence was relevant. 414 F. 3d, at 1136. The Court of Appeals further supposed the response to Juror Hailstone’s question compounded the problem, since psychiatric treatment presumably would be necessary only in aid of future rehabilitation. Id., at 1137.
The Court of Appeals’ analysis is flawed. To begin with, attributing to Juror Hern a dilemma over the scope of mitigation is only one way to interpret her questions, and, as the California Supreme Court observed on direct review, it is not necessarily the correct one, see Belmontes, 45 Cal. 3d, at 804, 755 P. 2d, at 344. It is at least as likely that the juror was simply asking for clarification about California’s overall balancing process, which requires juries to consider and balance enumerated factors (such as age and criminal history) that are labeled neither as mitigating nor as aggravating. As Juror Hern surmised (but sought to clarify), the jury itself must determine the side of the balance on which each listed factor falls. See Cal. Penal Code Ann. § 190.3 (providing that, “[i]n determining the penalty, the trier of fact shall take into account” any relevant listed factors); see generally Tuilaepa v. California, 512 U. S. 967, 978-979 (1994) (noting that the § 190.3 sentencing factors “do not instruct the sentencer how to weigh any of the facts it finds in deciding upon the ultimate sentence”).
Even assuming the Court of Appeals correctly interpreted Juror Hern’s questions, the court’s conclusion that this juror likely ignored forward-looking evidence presupposes what it purports to establish, namely, that forward-looking evidence could not fall within factor (k). As discussed earlier, nothing barred the jury from viewing respondent’s future prospects as “extenuat[ing] the gravity of the crime,” so nothing barred it from considering such evidence under the rubric of the “listing.” As for Juror Hailstone’s psychiatric-care question, this inquiry shows that, if anything, the jurors were considering respondent’s potential. The trial court’s *24 response, far from implying a broad prohibition on forward-looking inferences, was readily explicable by the absence of any evidence in the record regarding psychiatric care.
In view of our analysis and disposition in this case it is unnecessary to address an argument for reversing the Court of Appeals based on the Court’s holding in Johnson v. Texas, 509 U. S. 350 (1993), a subject raised by Judge O’Scannlain in his separate opinion in the Court of Appeals. See 414 F. 3d, at 1141-1142 (opinion concurring in part and dissenting in part).
IV
In this case, as in Boyde and as in Payton, the jury heard mitigating evidence, the trial court directed the jury to consider all the evidence presented, and the parties addressed the mitigating evidence in their closing arguments. This Court’s cases establish, as a general rule, that a jury in such circumstances is not reasonably likely to believe itself barred from considering the defense’s evidence as a factor “extenuating] the gravity of the crime.” The factor (k) instruction is consistent with the constitutional right to present mitigating evidence in capital sentencing proceedings.
The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.