**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FERNANDO BELMONTES,
   *Petitioner-Appellant,*

v.

ROBERT L. AYERS, JR., Warden for
the California State Prison at San
Quentin,

   *Respondent-Appellee.*

No. 01-99018

D.C. No.
CV-89-00736-DFL
Eastern District of
California,
Sacramento

En Banc ORDER

Filed December 30, 2008

Before: Stephen Reinhardt, Diarmuid F. O'Scannlain and
Richard A. Paez, Circuit Judges.

Order;
Concurrence by Judge Reinhardt;
Dissent by Judge Callahan

---

**ORDER**

Judges Reinhardt and Paez voted to deny the Respondent-Appellee's petition for rehearing and rehearing en banc. Judge O'Scannlain voted to grant the petition for rehearing and rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. FED. R. APP. P. 35.

The petition for rehearing en banc is denied.

16807

REINHARDT, Circuit Judge, concurring in the denial of the petition for rehearing en banc, joined by Judge PAEZ:

There is no greater burden that falls on a member of the judiciary than to sit in judgment on whether an individual shall live or die, and no greater responsibility than to make certain that every capital defendant receives the full protection to which he is entitled under our Constitution and our laws. When judges consider a case such as this, that not only presents serious questions of constitutional law but that may result in the most serious of human consequences, it is their duty to consider and weigh each constitutional claim made by the defendant with the utmost care. The failure to do so would be a failure to fulfill an obligation not only to the defendant, but to the public and to our legal system itself. Equally, it is the responsibility of a judge who disagrees with the court's decision to explain her disagreement fairly and objectively and to refrain from seeking to bias or mislead the reader with respect to the serious constitutional questions involved.

We write this brief concurring opinion to make one point clear.[1] Judge Callahan opens her dissent from the denial of the petition for rehearing en banc with the statement that "[t]his is the third time that a panel of this court has set aside Belmontes's death sentence." Dissent at 16811-12. Read in context, the implication, carefully phrased though it may be in its final iteration, is that we have flouted the will of the Supreme Court, and attempted to set aside Belmontes's death sentence on three separate occasions, or for three separate reasons. The sentence can serve only to bias the reader who reaches the merits of the constitutional question later in the dissent. More-

---

[1]Although we do not agree with the legal arguments advanced in Judge Callahan's dissent from the denial of the petition for rehearing en banc, they are proper subjects for fair debate among jurists. Our position, and the position of this court, as to those issues is set forth in the court's opinion, *Belmontes v. Ayers*, 529 F.3d 834 (9th Cir. 2008), and requires no further discussion here.

over, the sentence is accompanied by a footnote that makes it appear that the Supreme Court has twice reversed our prior decisions.

As Judge Callahan well knows, the panel which has considered Belmontes's death sentence for well over six years has at all times diligently sought to implement the Constitution and to fulfill its function of ensuring that individuals are not executed without due process of law. In that time, the majority of the panel that issued what is now the opinion of the court has found *two* serious and prejudicial violations of Belmontes's constitutional rights. A closely divided Supreme Court disagreed with *one* of those conclusions by a vote of 5-4. It has expressed no view on the second one — the violation that we consider here.

The single constitutional issue we resolved in Belmontes's favor prior to the current decision was the validity of a highly questionable jury instruction, which California had already changed because of its ambiguity if not its unfairness.[2] Unfortunately for Belmontes, the change came too late to help him. In the meantime, while our initial decision reversing the capital sentence based on the original instruction was pending, the Supreme Court upheld the instruction in a case governed by AEDPA, *Brown v. Payton*, 544 U.S. 133 (2005). It did so, however, not on the merits, but on the ground that any error did not meet the AEDPA requirements — requirements that were not applicable to Belmontes's case.[3] Instead of review-

---

[2]In 1983, "[j]ust a year after respondent's sentencing[,] the California Supreme Court evinced considerable discomfort with factor (k)," the instruction in question, and "inserted a critical footnote effectively amending factor (k) and expanding the evidence that a California jury could properly consider in deciding whether to impose a death sentence." *Ayers v. Belmontes*, 127 S. Ct. 469, 482 (2006) (Stevens, J., dissenting). Subsequently, the California legislature also amended the jury instruction in question in such a way as to confirm that "the category of evidence that may provide the basis for a sentence other than death is much broader that the category described in factor (k)." *Id.* at 482 n.2.

[3]Justice Breyer, who gave the majority its fifth vote in *Payton*, explicitly stated in his concurrence that "this is a case in which Congress'

ing our opinion invalidating the instruction in a pre-AEDPA case, the Court issued its customary GVR[4] so that we could determine whether its decision affected our ruling. *Brown v. Belmontes*, 544 U.S. 945 (2005). When we concluded that it did not, and that our pre-AEDPA ruling on the merits was not affected by the Court's post-AEDPA ruling, the Court for the first time agreed to consider on the merits the question of the constitutionality of the jury instruction. As noted, it ultimately upheld the instruction by a 5-4 vote. *Ayers v. Belmontes*, 127 S. Ct. 469 (2006). As is apparent from a comparison of the majority opinion and the dissent, as well as from the nature of the division in the Court, it was an extremely close question.

At the time we decided the jury instruction issue, we were aware that a second, equally serious, constitutional question had been raised regarding ineffective assistance of counsel. We decided, without objection, to resolve only the former issue in our first decision, for what appeared to us to be compelling reasons. Where the resolution of one constitutional issue will dispose of a case, thus obviating the need to reach a second, it is the general jurisprudential practice not to decide both questions simply in order to provide an alternative basis for the court's decision. Although it may be within our discretion to resolve more than one constitutional issue when it is unnecessary to do so, courts do not ordinarily act contrary to the well-established rule that we avoid deciding constitutional questions if we can arrive at the same result without reaching them.

---

instruction to defer to the reasonable conclusions of state-court judges makes a critical difference. *See* 28 U.S.C. § 2254(d)(1). Were I a California state judge, I would likely hold that Payton's penalty-phase proceedings violated the Eighth Amendment." *Payton*, 544 U.S. at 148 (Breyer, J., concurring).

[4]Order granting, vacating, and remanding.

In our present opinion, then, we are simply doing what the law requires of us — confronting an extremely serious, unquestionably legitimate constitutional issue that we found no reason to reach the first time the case was before us. That issue is whether defendant's counsel provided ineffective assistance at the penalty phase. Upon exhaustive review of the law and the facts before us, we agreed with Belmontes and concluded that he had received and been prejudiced by constitutionally deficient representation.

Judge Callahan's introduction subtly distorts what has transpired in the pertinent judicial proceedings and leaves the reader with a false impression of what this court has done in the past and what it is doing now. More important, it frames the ensuing discussion so as to prejudice the uninformed reader's view of the merits of the constitutional case. Putting our fellow human beings to death is far too serious a business for a resort to such tactics — or for judges to allow themselves to be swayed by them. Here, our colleagues have rightly denied the petition to rehear the case en banc, and the vast majority of this court's active judges have declined to sign their names to Judge Callahan's dissent. With the assurance that we have faithfully upheld the Constitution, and that we have done nothing less than give the most deliberate consideration to each claim presented to us, we regretfully find it necessary to file this concurrence in the denial of the petition for rehearing en banc.

---

CALLAHAN, Circuit Judge, with whom O'SCANNLAIN, KLEINFELD, GOULD, TALLMAN, BYBEE, BEA, and N.R. SMITH, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I again must respectfully dissent from denial of rehearing en banc. This is the third time that a panel of this court has

set aside Belmontes's death sentence.[1] However, even if this were our first exposure to the case, the panel's majority opinion has created a standard for effective assistance of counsel in a death penalty case that, in effect, guarantees a defendant a second penalty stage trial. The majority's interpretation of the facts in this case eviscerates the prejudice prong of the test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).[2] In doing so, the majority ignores both the achievements of Belmontes's counsel as well as Belmontes's own approach to his case.

I

The majority asserts that counsel should have presented mitigating evidence that Belmontes as a child functioned well in a deplorable environment until the onset of rheumatic fever when he was 14 years old "left him isolated from his peers and depressed," and "led him to engage in regular drug use beginning when he was in his early teens." *Belmontes v. Ayers*, 529 F.3d 834, 865 (9th Cir. 2008). It notes that the jury "never heard testimony about the traumas that Belmontes faced as a youth; it never heard that he possessed many positive attributes, and it never heard that he had struggled with substance abuse since his early teens."[3] *Id.* at 866. The majority asserts that if this evidence had been presented "there is a reasonable probability that the jury would have come to a different conclusion about Belmontes's sentence." *Id.*

---

[1]*See Belmontes v. Woodford*, 335 F.3d 1024 (9th Cir. 2003), *amended* 350 F.3d 861, *rev'd sub nom. Brown v. Belmontes*, 544 U.S. 945 (2005); *Belmontes v. Brown*, 414 F.3d 1094 (9th Cir. 2005), *rev'd in Ayers v. Belmontes*, 549 U.S. 7 (2006).

[2]A panel took a similar approach to the prejudice prong in *Correll v. Ryan*, 539 F.3d. 938, 970-82 (9th Cir. 2008) (Judge Callahan's opinion dissenting from the denial of rehearing en banc, joined by Chief Judge Kozinski and Judges O'Scannlain, Kleinfeld, Tallman, and Bea).

[3]The majority admits that it does "not suggest that Belmontes was under the influence of drugs during the commission of the murder." *Belmontes*, 529 F.3d at 865 n.18.

This is a myopic reading of the record and ignores what would have been the devastating consequences of any attempt to relate Belmontes's childhood experiences to his murder of Steacy McConnell. The majority is able to develop its analysis only by ignoring or minimizing the fact that Belmontes's attorney, John Schick, had managed to exclude from the jury's consideration all evidence that Belmontes had not only previously committed a cold-blooded, execution-style murder, but had also told several people that he had done so. Any further effort to promote Belmontes's childhood experiences as a mitigating factor would have resulted in the jury learning that Belmontes had committed a prior murder and had basically gotten away with it. Because the available evidence of Belmontes's prior murder is damning, counsel's failure to explore the mitigating evidence was not prejudicial.

What sets this case apart from other cases — what distinguishes it from *Mayfield v. Woodford,* 270 F.3d 915 (9th Cir. 2001) (en banc), and *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), on which the majority relies — is the extraordinary evidence that Belmontes had previously committed a cold-blooded, execution-style murder. This was the elephant in the courtroom. Belmontes knew of the evidence, the prosecutor knew of the evidence, and the judge knew of the evidence, but Belmontes's counsel managed to keep the jury from hearing the evidence.

The evidence was overwhelming. In the spring of 1979, two years before Belmontes murdered Steacy, Jerry Howard's body was found in a secluded, semi-rural area. "He had been executed with a bullet to the back of the head." *Belmontes*, 529 F.3d at 880 (O'Scannlain, J., dissenting). In his dissent from the majority's opinion, Judge O'Scannlain recounts the evidence connecting Belmontes to this execution as follows:

> A parole report prepared for Belmontes on May 11, 1979, remarked that "the method in which the murder was carried out indicate[d] planning, sophistica-

tion, and premeditation." Witness testimony offered strong evidence against Belmontes. However, "because of lack of cooperation on the part of the witnesses, [Belmontes] could not be tried for murder." **FN3** Still, the police could prove that Belmontes possessed the gun used to kill Howard, so Belmontes agreed to plead to a charge of accessory after the fact to voluntary manslaughter. The police remained convinced of his principal role.

> FN3. Police records revealed that two days after the crime the police had received a call from an anonymous informant that Belmontes had stated: "I shot that guy in the head." Another anonymous call informed the police that Belmontes had been seen with Howard just before Howard was killed. Other witnesses contributed circumstantial evidence.

Once shielded from prosecution by double jeopardy, Belmontes confessed to several persons that he had shot Howard. While investigating Belmontes's criminal history in preparation for the McConnell murder trial, both Schick and the district attorney discovered that these persons, unlike the witnesses in 1979, were willing to testify. They included Belmontes's case worker at the California Youth Authority ("CYA"), Charles Sapien, who told the district attorney in 1982 that Belmontes had confessed to shooting Howard. Sapien recounted that Belmontes had denied the crime during his incarceration at CYA, but had confided to Sapien upon his release that he had "wasted that guy." Another witness was Steven Cartwright, who informed the district attorney that Belmontes had confessed to him that he had killed Howard, but that in 1979, Belmontes's mother had begged him not to testify. Another witness was

Detective Jake Donaldson, a longtime friend of the Belmontes family, who told Schick's investigator that the Howard killing "was definitely an execution type murder with [Belmontes] being the principal involved." Belmontes does not deny the truth of this evidence.

529 F.3d at 880-81 (footnote 4 omitted).

The prosecutor was ready to present these witnesses and other evidence of Belmontes's criminal history, but Belmontes's attorney prevailed upon the court "to limit the extent of testimony to the crime of conviction: accessory after the fact to voluntary manslaughter." *Id.* at 881. In its petition for rehearing, the state offered the following perspective on this ruling:

> Prior to the penalty-phase trial, Schick accomplished what can be fairly described as a minor legal miracle. The prosecution had moved to introduce additional evidence about Belmontes' 1979 conviction of being an accessory after the fact to voluntary manslaughter. Specifically, the prosecution proffered evidence that Belmontes had in fact murdered the victim in the case, Jerry Howard, and had confessed to the killing after being committed to CYA for the offense. (RT 2237-2240, 2261).
>
> Schick persuaded the court to disallow this evidence on the ground that the accessory conviction was res judicata. (RT 2245-46, 2254, 2263.) The court's limitation on the State's ability to present this additional aggravating evidence was a clear violation of California law. See *People v. Koontz*, 27 Cal.4th 1041, 1087 (2002); *People v. Bradford*, 15 Cal.4th 1229, 1375 (1997).

Even though the trial court had excluded evidence of Belmontes's role in Howard's murder, counsel had to remain vigilant to keep the devastating evidence out.[4] In his dissent, Judge O'Scannlain writes:

> Both parties were aware, however, that the trial court might admit the Howard evidence for other purposes, such as to rebut or to impeach testimony of character witnesses for the defense. *See* Cal. Evid. Code § 1102(b) (permitting the prosecution to use character evidence, including prior bad acts, "to rebut evidence adduced by the defendant"). The trial transcript substantiates the risk cross-examination posed to the defense. At one point, the defense attorney inadvertently elicited testimony from Belmontes's friend Robert Martinez that Belmontes was not a violent person. Outside the hearing of the jury, the prosecutor informed defense counsel and the court that he intended "to cross-examine [Martinez] fully about his knowledge of other violent actions done by Mr. Belmontes" unless the court struck the evidence from the record. He noted that "counsel was well aware of all the witnesses I have lined up to testify to [Belmontes's violent past]." [FN5] The court agreed: "*I'm going to have to allow him to go into the whole background if we don't do that.*" (emphasis added). Schick immediately acquiesced; the judge ordered Martinez's character testimony stricken from the record and admonished the jury to disregard it. This incident leaves little doubt that the

---

[4]In his dissent, Judge O'Scannlain notes that at his deposition, Schick indicated that the Howard evidence had given him " 'grave concern' and that he had structured his arguments and witnesses to avoid its admission." *Belmontes*, 529 F.3d at 881. Schick "told habeas counsel that the prosecution had intended to call Detective Donaldson, who would have testified to the 'cold-blooded fashion' in which Howard had been killed. When asked whether he believed such evidence would be 'devastating,' Schick said: 'Certainly.' " *Id.*

court was ready to admit the Howard evidence for rebuttal or impeachment.

> FN5. He stated that he would test the witness's knowledge of the facts that as a young man, Belmontes attempted to seize a police officer's gun during an arrest, that he carried a gun to school because he was having trouble with schoolmates, that he was a member of the Black Angels gang in Ontario, California, and that he murdered Jerry Howard. The record shows that the prosecution had extensive files to back up these allegations.

*Belmontes*, 529 F.3d at 881.

In light of the available evidence and the trial court's willingness to admit it on cross-examination, any effort to develop the majority's mitigating evidence would have resulted in the admission of the aggravating evidence and the jury imposing the death penalty. The approach proposed by the majority could only be suggested after all other tactics to avoid the death penalty have failed. Indeed, there can be no doubt that had counsel followed the majority's advice and sought to develop the mitigating evidence with the result that Belmontes's confessions to murdering Howard were admitted, Belmontes would have had a compelling claim of ineffective assistance of counsel.

## II

The majority attempts to circumvent this barrier to prejudice by focusing on all the ways that counsel, in the majority's opinion, failed to provide effective assistance. However, even accepting the majority's characterization of counsel's efforts, it is clear that the excluded aggravating evidence far

outweighed any benefit that might have arisen from the admission of further mitigating evidence.

The majority asserts that counsel failed:

> - to conduct an adequate investigation of possible mitigating evidence and to properly prepare Belmontes for the penalty phase of the trial, *Belmontes*, 529 F.3d at 849-51;

> - to present additional mitigating evidence to the jury, *id*. at 851-853;

> - to present to the jury "substantial evidence in mitigation that might have humanized Belmontes," *id*. at 863;

> - "to adequately prepare his witnesses to testify with the result that their testimony was unhelpful and possibly even damaging," *id*.;

> - "to present an expert to explain the relevance of the available mitigating evidence to the jury," *id*.; and,

> - "to explain to the jury in his closing argument the relevance of the small quantum of mitigating evidence he did introduce, and failed to make any of the critical humanizing arguments that might influence a jury," *id*.

Judge O'Scannlain's dissent notes a number of the factual problems with these assertions.[5] However, the key flaw in the

---

[5]For example, the majority asserts that Schick "did not effectively prepare the lay witnesses he called to testify." *Belmontes*, 529 F.3d at 861. In particular, the majority contends:

> Several of the witnesses who knew Belmontes best and clearly could have provided compelling mitigating evidence did not tes-

majority's approach is a failure to recognize that whatever Belmontes's character and childhood experiences, and whatever the effect on him of contracting rheumatic fever at the age of fourteen, this mitigating evidence was unlikely to be meaningful to a jury without — as the majority puts it — "an expert who could make connections between the various themes in the mitigation case and explain to the jury how they could have contributed to Belmontes's involvement in criminal activity." *Id.* at 853. But no expert could form an opinion on how the "themes in mitigation" might "have contributed to

tify to a single positive quality he possessed. Instead, witness after witness told the same jury that had just found Belmontes guilty of first degree murder beyond a reasonable doubt, that Belmontes should not receive the death penalty because he was innocent. Most glaringly, Belmontes's own mother did not offer a single reason not to execute her son, although she obviously could have done so had she been properly advised regarding the purpose and nature of the inquiry.

*Id.* (footnotes omitted).

Judge O'Scannlain questions whether the limited appeal of the witnesses' testimony fairly reflects a lack of coaching. *Id.* at 891. He further notes:

The majority does not explain what positive qualities were not mentioned, but could have been illuminated. Belmontes's mother already had told the jury that Belmontes had a close relationship with his sister. His grandfather had described Belmontes's faithfulness to his grandmother. His friends Robert and Darlene Martinez had described their close relationship. Rev. Barrett and the Haros had described the sincere religious commitment Belmontes made during his CYA incarceration. Finally, Miller had testified to Belmontes's ability to make a positive contribution while in prison.

*Id.* at 891-92 (footnotes omitted). Thus, the lack of testimony may not have been a result of ineffective assistance of counsel. Moreover, despite the majority's insinuation to the contrary, this court has recognized that "residual doubt has been recognized as an extremely effective argument for defendants in capital cases." *Williams v. Woodford,* 384 F.3d 567, 624 (9th Cir. 2004) (*quoting Lockhart v. McCree,* 476 U.S. 162, 181 (1986)).

Belmontes's involvement in criminal activity," without learn-
ing of, and considering, Belmontes's murder of Howard.
Accordingly, any expert who might have been able to testify
in support of the majority's "themes in mitigation" would
have been subject to cross-examination about Belmontes's
role in Howard's murder. It seems self-evident that a jury that
had already convicted Belmontes of first degree murder
would not be swayed by evidence of his difficult childhood
when that evidence also reveals to the jury that Belmontes
previously committed an execution-stye murder, was only
convicted of being an accessory after the fact, and had subse-
quently told several individuals that he had "wasted that guy."

The majority's rejoinder to this concern is not well con-
ceived. It offers the following line of argument, without any
citations to authorities:

> Even were we to reach the question whether the call-
> ing of an expert regarding childhood traumas and
> their effect would open the door to evidence regard-
> ing Howard, we would conclude that it would not.
> Obviously, the expert would know about the instant
> murder, and thus understand the gravity of Bel-
> montes's criminal conduct. However, an expert's
> opinion as to whether a set of circumstances during
> an individual's period of emotional development
> could lead to serious criminal conduct is in no way
> dependent on whether the defendant committed one
> or two murders or even on whether he committed
> any. The critical testimony from an expert is that as
> a matter of psychological experience and knowledge,
> certain childhood traumas can result in a person's
> becoming likely to engage in subsequent criminal
> conduct, not that they always do and not that they
> necessarily did in the particular case before the jury.
> There would be no basis for suggesting that such a
> professional opinion would be any different if the

> expert were informed that Belmontes committed two murders rather than one.

529 F.3d at 869 n.20.

What attorney or judge is compelled to accept the majority's unsupported conclusion that the expert's professional opinion would not be "any different if the expert were informed that Belmontes committed two murders rather than one"? Common sense certainly suggests otherwise. Might not the nature of the first murder be relevant to the character of a murderer at the time of the second murder? Wouldn't the fact that Belmontes committed an execution-style murder in 1979 have some impact on his character in 1981? More importantly, wouldn't the prosecution be entitled to ask the expert to explain why the first murder did or did not affect his professional opinion? Thus, even assuming that the knowledge of the Howard murder would not have had any impact on an expert's opinion, the trial court would have had to allow the prosecution to cross-examine the expert on this issue. Accordingly, the jury would have learned of Belmontes's role in the Howard murder.[6] Try as it might, the majority cannot exorcize the elephant from the room.

## III

The majority's approach renders meaningless the standard set forth in our en banc opinion in *Mayfield*. In *Mayfield*, we held that a court "must carefully weigh the mitigating evidence (both that which was introduced and that which was

---

[6]Even the lay witnesses that the majority argues counsel should have called would have had to be very careful not to suggest that Belmontes was not violent, as such a suggestion would have allowed the prosecution to question them about the Howard murder. As noted, this is exactly what happened when Belmontes's friend, Robert Martinez, testified that Belmontes was not a violent person. *Belmontes*, 529 F.3d at 881. Belmontes's attorney had to agree that Martinez's testimony would be stricken in order to prevent him from being cross-examined about the Howard murder. *Id.*

omitted or understated) against the aggravating evidence, *Williams* [*v. Taylor*], 529 U.S. [362,] 397 . . . [(2000)], and determine whether there was 'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' *Strickland,* 466 U.S. at 695." *Mayfield*, 270 F.3d at 928 (footnote omitted). Although this balancing test gives the defendant the benefit of every doubt, here, the admission of Belmontes's confessions to murdering Howard would have overwhelmed any additional mitigating evidence that the majority argues counsel should have presented. There is no possibility that the admission of the additional mitigating evidence, accompanied as it would be by the aggravating evidence, would have changed any reasonable juror's mind.

This conclusion is reinforced by a review of the allegedly mitigating evidence. First, Belmontes's counsel did present a number of witnesses in an attempt to humanize Belmontes. As noted by Judge O'Scannlain in his dissent, "several aspects of Belmontes's positive childhood characteristics *were* presented: Belmontes's mother told the jury of his 'close' relationship with his sister, his grandfather spoke of Belmontes's devotion to his grandmother, the jury learned that Belmontes had assumed a leadership position on his CYA fire crew and had joined the 'M2' religious program while in CYA custody." *Belmontes*, 529 F.3d at 890.

The inquiry thus becomes what other mitigating evidence might have been proffered. The majority paints the following picture:

> [I]n addition to growing up in a poverty-stricken family in which his father, a profound alcoholic, beat his mother severely and regularly, Belmontes dealt with a host of other traumas. When he was five years old, for example, his 10-month-old sister died of a brain tumor. After her death, Belmontes exhibited symptoms of depression and repeatedly visited the

cemetery where she had been buried. In addition to dealing with his father's alcoholism, Belmontes also suffered as a result of his maternal grandmother's alcoholism and prescription drug addiction, which, in combination with her manipulative and controlling behavior, caused constant strife within both his immediate and extended family.

In spite of the adversity he experienced, Belmontes was a kind, responsible and likeable child with a very pleasant demeanor. He was a loving and protective older brother to his two younger siblings, and was kind and respectful toward his maternal grandparents notwithstanding the fact that they disapproved of him on account of his mixed racial background. He participated in Little League, the Navy Cadets, team sports, and had a paper route. In his early years, he kept up in school, made friends easily, and got along with his teachers.

At age 14, however, Belmontes was beset by rheumatic fever, a condition for which he was repeatedly hospitalized. The disease was significantly debilitating and required him to stop attending school and to terminate his involvement in sports and other social activities. As a result, he was isolated from his peers and unable to pursue the means through which he had formerly escaped his traumatic home life. He was also repeatedly told that, as a result of this condition, he would likely not live past 21 years of age. He became depressed, withdrawn, and lost some of the positive personality traits that seemed to be developing during his early years.

*Id*. at 851-52 (footnote omitted).

The majority further relates that shortly after Belmontes contracted rheumatic fever, his mother and stepfather divorced, and then comments:

As a result, the family was forced to move into a cheap motel in which Belmontes and four family members lived in "a really small, one-room shack." During this time, their lives were disrupted and unstable. His mother's behavior became erratic. She engaged in casual sexual relations with a number of men, and frequently brought the men back to the motel room in which the family lived.

By the time he was a teen, Belmontes had started using drugs on a regular basis. Around the time of McConnell's murder, he was regularly using marijuana, heroin, LSD, and PCP.

*Id*. at 852 (footnote omitted).

There can be little doubt that Belmontes had a wretched childhood. But Belmontes's past included additional aggravating factors as well as the majority's selected mitigating factors. Furthermore, the relevance of the "traumatic experiences" would not have been meaningful to a jury without the use of expert witnesses (who would have had to have been informed of the Howard murder).[7]

The record indicates that in addition to the murder of Howard, there were additional aggravating factors in Belmontes's past that were not presented to the jury. These include his attempt to seize a police officer's gun during an arrest, and his carrying a gun to school because he was having trouble with schoolmates. *Belmontes*, 529 F.3d at 881 n.5. Also, there was evidence that he was a "heavily involved" member of the

---

[7]The majority chastises counsel for failing "to explain to the jury how those experiences affected Belmontes; what the relationship was between the tragic events and Belmontes's subsequent criminal conduct; and why the jury should consider those circumstances in determining whether Belmontes was an individual who should be put to death or whose life should be spared." *Belmontes*, 529 F.3d at 847.

Black Angels gang, had "a long history of anti-social behavior," had been very fortunate not to have been caught, and was "very manipulative." *Id*. at 889 n.21. There was also some question as to the severity of his rheumatic fever and its effect. One doctor thought the illness was "pretty mild." *Id*. at 885. Belmontes's sister testified that she did not notice any emotional change in him from the illness, *id*. at 887, and his mother stated that he used his illness as an excuse to be lazy. *Id*. at 889.

The majority's assertion that at the time that Belmontes murdered Steacy "he was regularly using marijuana, heroin, LSD, PCP and other drugs" is a two-edge sword. The majority admits that Belmontes was not under the influence of drugs when he murdered Steacy. *Id*. at 865 n.18. Instead, it argues that his "drug use should have been presented to humanize him by showing how the tragic circumstances he experienced while growing up adversely affected him." *Id.* This perspective is contrary to our observation in *Mayfield* that "juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior." 270 F.3d at 931 n.17.

In sum, the record does not support the majority's assertion that there was "a large quantity of mitigating evidence . . . that was never uncovered or presented to the jury." *Belmontes*, 529 F.3d at 851. Rather, the weight and relevance of the additional mitigating evidence was far more problematic than the majority admits. It would have been completely overwhelmed by the evidence of Belmontes's confessions to murdering Howard. Moreover, there is no suggestion that further investigation would have disclosed some previously unknown physical or psychiatric condition or traumatic childhood event. Based on the foregoing, there is no reasonable probability that the additional mitigating evidence could possibly outweigh the aggravating evidence of Belmontes's admissions to murdering Howard and result in a different conclusion by the

jury. The majority's contrary assertion seems to render meaningless the standard adopted in *Mayfield.*

## IV

In addition, while counsel's approach to the penalty phase was consistent with the position taken by Belmontes, the majority's newly-created theory is contrary to Belmontes's repeated statements to the jury. Belmontes testified three times during his trial. He first testified during the guilt stage of the trial. *Belmontes*, 529 F.3d at 839. He then testified at the penalty stage and, as the majority notes, "[a]lthough he described his youth as 'pretty hard,' he twice stressed that he did not want to 'use it as a crutch.' " *Id*. at 842. Finally, after the prosecutor's closing argument, the court permitted Belmontes to address the jury, and he reiterated that "although his childhood was not 'a very good childhood,' he did not want to use it as a crutch," and that even though he was now a born-again Christian he also did not want to use that as a crutch. *Id*. at 844-45.

Belmontes attempted to "humanize" himself before the jury by arguing that despite his difficult childhood, he was now taking some responsibility for his actions. The majority attempts to humanize Belmontes by arguing that he was a victim of his upbringing and could not control his actions. The fact that Belmontes's approach failed to convince a jury to give Belmontes life imprisonment does not mean that defense counsel should be faulted for not taking an approach that was inconsistent with Belmontes's position and no more promising.[8] Viewed at the time of the penalty phase of the trial, it would have been blatantly incompetent for defense counsel to abandon an approach that was consistent with his client's perspective in favor of an attempt to blame the murder on

---

[8]It appears that the cold-blooded, execution-style murder of Howard is contrary to the majority's supposition that Belmontes was subject to uncontrollable fits of anger as a result of his childhood traumas.

Belmontes's traumatic childhood. The reasonableness of defense counsel's action is, of course, influenced "by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.

V

The majority's exacting dissection of counsel's performance at trial a quarter of a century ago fails to heed the Supreme Court's admonition that the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. *See also Edwards v. Lamarque*, 475 F.3d 1121, 1127 (9th Cir. 2007) (en banc) (citing *Strickland*, and stating that a reviewing court must consider the circumstances at the time of counsel's conduct, and cannot "second-guess" counsel's decisions or view them under the "fabled twenty-twenty vision of hindsight") (internal citations omitted).

Here, counsel, having succeeded in keeping from the jury the most incriminating evidence in Belmontes's background, appears to have neglected to investigate and develop possibly-mitigating factors from Belmontes's youth. However, even at this late date, it is clear that the presentation of the possibly-mitigating factors would most likely have resulted in the jury learning of Belmontes's confessions to the murder of Howard. Counsel properly recognized that this evidence would have been "devastating." *Belmontes*, 529 F.3d at 881. Moreover, as noted, the theory of mitigation now advocated by the majority was inconsistent with Belmontes's approach to his defense. Under these circumstances, any failure to investigate and develop mitigating evidence based on Belmontes's wretched childhood was harmless. Belmontes cannot show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## VI

We should have reheard this case en banc not so much because the majority was not aware of the applicable law, but because its particular view of the facts will make it almost impossible for a court in the Ninth Circuit not to grant a capital defendant a new penalty stage trial any time counsel has to balance presenting additional mitigating evidence against any aggravating evidence that would most likely accompany the mitigating evidence. Competent counsel will decline to present the mitigating evidence, possibly even decline to investigate it, knowing that the Ninth Circuit will second-guess his or her decision, even if the aggravating evidence consists of a confession to a prior murder.

The majority opinion that creates this situation results from a failure to heed the Supreme Court's admonition that the reasonableness of counsel's action must be evaluated as of "the time of counsel's conduct," *Strickland,* 466 U.S. at 690, and the skewing of the balancing test we adopted in *Mayfield*, 270 F.3d at 928. Accordingly, I dissent from the denial of rehearing en banc.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2008 Thomson Reuters/West.